UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Mark B., | ) |
| *Plaintiff*, | ) ) ) |
| | ) Case No. 20 CV 50164 |
| v. | ) |
| | ) Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) |
| Commissioner of Social Security, | ) ) |
| *Defendant*. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mark B. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying his disability insurance benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion.

**I. Background**[1]

Plaintiff submitted his application for disability insurance benefits in July 2017. Plaintiff alleged disability due to anxiety, carpal tunnel syndrome, fibromyalgia, irritable bowel syndrome, arthritis, degenerative disc disease, spinal stenosis, and acid reflux disease with an alleged onset date of September 7, 2016. His date last insured is March 31, 2019. Plaintiff's claim was initially denied in October 2017, and upon reconsideration in January 2018. Plaintiff filed a written request

---

[1] As explained further below, Plaintiff challenges only mental/psychological aspects of the Commissioner's decision. Accordingly, the background section will focus primarily on providing an overview of the mental/psychological evidence in the administrative record.

1

for a hearing, and the Administrative Law Judge ("ALJ") held a video hearing on April 9, 2019. The ALJ heard testimony from Plaintiff, as well as Dr. Steven Goldstein, a medical expert ("ME"),[2] and Linda Gells, a vocational expert ("VE").

At the time of the hearing, Plaintiff was 51 years old. R. 52. He resides with his wife and has three children from a prior marriage. The children live with their mother, but Plaintiff stated that he sees his teenage daughter "all the time." R. 59-60. Plaintiff's highest level of education completed was sophomore year of high school. R. 52.

Plaintiff testified that he was receiving ongoing treatment for anxiety, depression, and PTSD. R. 54. Plaintiff reported that the cause of his PTSD was abuse from his ex-wife for numerous years, including spending 10 years going through a divorce. He estimated that he has spent about 60 days a year in court. R. 55-56. With respect to his PTSD symptoms Plaintiff testified that he has nightmares every night, experiences flashbacks, and avoids certain routes and activities for fear of triggering something. R. 55. On his 2017 Function Report, Plaintiff reported that he has insomnia, averages 2 to 3 hours of sleep a night, and takes "numerous cat naps" during the day. R. 266-67. Plaintiff also reported that his anxiety prevents him from attending social events. R. 266.

At the hearing, Plaintiff stated that he was taking the following psychiatric medications: Prazosin for nightmares; Xanax 4 or 5 times a day for anxiety; and an antidepressant he had just been prescribed two months prior. He reported that he also takes two blood pressure medications. R. 61. Regarding the side effects from his medications, Plaintiff testified:

> One causes depression, the other one counters depression. One causes heartburn, one causes memory loss, one causes paranoia. . . The only medication I know of that doesn't have any serious side effects besides making me so relaxed that I fall asleep is the Xanax.

---

[2] The ME's testimony related exclusively to Plaintiff's physical issues, so it will not be included in the background section. *See* R. 75.

R. 69-70. When asked how often he falls asleep during the day, Plaintiff responded that he takes 2 to 4-hour naps during the day. R. 70.

In addition to medication, Plaintiff reported that he sees his therapist weekly, attends group treatment weekly, and sees his psychiatrist monthly. R. 53-54. He began seeing his therapist and psychiatrist in the fall of 2017 and had just started his group therapy 2 weeks prior to the hearing. R. 54. Plaintiff also testified that he got a service dog 5 weeks prior to the hearing and that they were working on the aspect of training where they were forming a bond. R. 68-69. He shared that he went to Walmart for the first time by himself the week prior and the service dog "really helped" him. R. 69. Plaintiff expressed that it was difficult for him to come to the hearing, especially when he found out he couldn't bring his service dog. He stated, "It was really hard to come here today. I was scared to death." and testified that he had been "popping Xanax and taking other stuff" to calm him down and prepare him to show up. R. 68-69. When Plaintiff was asked if he would need to have the service dog if he was going to work, he responded: "If – he goes to the bathroom with me." R. 69.

Plaintiff reported that his daily activities include watching TV, sleeping, and trying to exercise, depending on the day. R. 267. His mental health treatment notes indicate that he had written a book which was published in 2018 and sold 71 copies. R. 1001. He reportedly began writing another book about his experiences in court to help relieve stress. R. 982. He testified that he used to do chores but does not do them anymore. He stated that he used to cook but stopped because he would forget about things and burn them. R. 60. Plaintiff testified that he sometimes drives himself places because his wife works and is unable to do so. R. 59.

When asked why he thinks he cannot work, Plaintiff responded: "Well, besides the physical thing, my hands, it's – probably the biggest thing is probably the mental aspect." R. 67-68. With

respect to how his depression, anxiety, and PTSD keep him from working, Plaintiff explained that at his last job he noticed it was getting hard to be around and talk to people. He stated that he started having trouble breathing and had chest pain. He testified that he had tests done on his heart and the doctors concluded he was experiencing panic attacks. R. 56. Plaintiff also stated that he is sometimes unable to leave the house and struggles in public places. R. 58-59. He testified that his "paranoia gets bad sometimes," and shared that he had a surveillance system installed on his house because he thought his ex-wife or someone else was watching him. R. 58-59, 68.

The VE testified at the end of the hearing. The first hypothetical posed by the ALJ was an individual with Plaintiff's age, education, and work history who can work at the light exertional level; occasionally climb ladders, ropes, and scaffolds; frequently climb ramps, stairs, stoop, kneel, crouch, crawl, and balance; and can understand, remember, and carry out simple instructions with simple, routine, and repetitive tasks with sufficient concentration, persistence, or pace to timely and appropriately complete such tasks. Additionally, the individual could have occasional brief and superficial contact with coworkers, supervisors, and the general public, and would not have any problem-solving tasks with the general public or fast-paced production rate or strict quota requirements. R. 90-91. The VE testified that the individual could not perform any of Plaintiff's past work, but there would be other work such as a cleaner housekeeper, machine tender, and inspector. R. 91-92.

The ALJ asked the VE whether there would be competitive work for an individual who was off task more than 15% of the workday, and the VE responded that there would not. R. 92. When asked whether 2 to 4 naps a day would fall under the category of being off task more than 15% of the time, the VE explained that what is typically allowable in terms of breaks would be a 10-15 minute break in the morning, another in the afternoon, and a 30-minute lunch break. The

4

VE testified that if the person required extra off task periods beyond what is typically allowable, it would not be compatible with competitive work. R. 92-93.

When asked whether a person who needs a service dog at work would be employable, the VE testified:

> I don't think the issue is whether employable. I would say that a service dog, I would characterize that as a job accommodation. . . . I don't think the issue is really employability. I would just say in terms of Social Security's framework, I am to consider occupations, not those that require a job accommodation. So in the world outside of Social Security, I don't think it means the person is unemployable. But within this framework, . . . I would say there would be no jobs that I could cite.

R. 93-94.

In May 2019, the ALJ denied Plaintiff's request for benefits. R. 15. She found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, degenerative joint disease of the bilateral hands, obesity, depressive disorder, anxiety disorder, and PTSD. The ALJ considered Listings 1.02, 1.04, 12.04, 12.06 and 12.15, but determined Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. R. 21. She found that Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. R. 22-23. The ALJ concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except occasionally climbing ladders, ropes, and scaffolds; frequently climbing ramps and stairs, stooping, kneeling, crouching, crawling, and balancing; can understand, remember, and carry out simple instructions for simple, routine, and repetitive tasks with sufficient concentration, persistence, or pace to timely and appropriately complete such tasks; occasional brief and superficial contact with coworkers, supervisors, and the general public; and no fast-paced production rate or strict quota requirements. R. 23. The ALJ

found that, although Plaintiff could not perform any past relevant work, there were a significant number of jobs in the national economy that Plaintiff could have performed. R. 29.

On April 1, 2020, Plaintiff submitted "new and material" evidence in the form of a letter from Plaintiff's therapist, Laura Arnold, to the Appeals Council and requested a remand of the case. R. 10. In the evidentiary letter, Ms. Arnold wrote:

> [Plaintiff] will greatly benefit from having his emotional support animal, Hugo, as listed as part of his treatment recommendations. The presence of this animal is necessary for his mental health and emotional well-being because its presence will mitigate the symptoms he is experiencing.

R. 11. On April 10, 2020, the Appeals Council issued a letter to Plaintiff denying his request for review. R. 1. The Appeals Council referenced other evidence that they had received but did not list Ms. Arnold's letter among that evidence. R. 2.

In May 2020, Plaintiff filed a complaint with the Court requesting judicial review of the Commissioner's adverse decision.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id*. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence).

6

A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5 (N.D. Ill. Oct. 29, 2014).

### III. Discussion

Plaintiff raises three arguments: (1) the ALJ failed to analyze two lines of evidence; (2) the ALJ inadequately evaluated the opinion of Plaintiff's psychiatrist; and (3) the ALJ improperly played doctor in assessing Plaintiff's mental RFC. The Court will address each in turn.

#### A. Lines of evidence

Plaintiff asserts that the ALJ failed to analyze two lines of evidence – his need for a service dog and the side effects of his medications.

*i. Service dog*

Plaintiff first argues that the ALJ "did not even minimally consider the uncontroverted testimony about the service dog" and, although she recited some of it, she still "failed to fulfill the ALJ's duty to consider all of the evidence." Pl.'s Br. at 6, Dkt. 20. Plaintiff points to the letter from Ms. Arnold to assert that there is at least some evidence showing that Plaintiff's use of a service dog was medically necessary. *Id*. at 7. Plaintiff argues that the letter from Ms. Arnold constituted evidence that was new, material, related to the period at issue, and could have changed the outcome of the case, so remand is required. *Id*. 7-8.

The Commissioner responds that the ALJ sufficiently considered Plaintiff's subjective allegations but declined to accept them. Def.'s Resp. at 8-9, Dkt. 25. He argues that the ALJ acknowledged Plaintiff's testimony about the emotional support dog but pointed out Plaintiff had just received the dog 5 weeks prior and his late 2018 treatment notes reflected reasonable improvement in his symptom management. *Id*. at 8. Regarding the letter from Ms. Arnold, the Commissioner points out that, although the Appeals Council did not discuss the letter in its April 10, 2020 denial of Plaintiff's request for review, the letter was submitted nearly a year after the ALJ's decision and long after the July 8, 2019 deadline for submitting additional evidence. *Id*. at 9. The Commissioner argues that, even if the Appeals Council erred by not discussing the letter, the error is harmless because Plaintiff has not shown the evidence should be accepted. *Id*. at 10-11.

*a. Letter from Ms. Arnold*

The Court will first address the issue regarding the letter submitted to the Appeals Council. Under SSA regulations, "[e]ach party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 404.935(a). However, within 60 days of receiving notice of the ALJ decision, a party may request that the Appeals Council review an ALJ's decision. *Id*. § 404.968(a)(1). The Appeals Council will review a case if they receive additional evidence that is new, material, relates back to the period on or before the date of the decision, and there is a reasonable probability that the evidence would change the outcome of the decision. *Id*. § 404.970(a). The claimant must also show "good cause" for not submitting the evidence to the ALJ before the ALJ's decision. *Id*. § 404.970(b). Good cause is defined as having been misled by some action of the agency; being prevented by a physical, mental,

8

educational, or linguistic limitation; or being prevented by an unusual, unexpected, or unavoidable circumstance beyond the claimant's control. *Id*.

As stated above, Plaintiff submitted a letter written by Ms. Arnold to the Appeals Council on April 1, 2020 (almost a year after the ALJ issued her May 9, 2019 decision and nearly 9 months after the Appeals Council's deadline to request a review of the decision). The Appeals Council denied Plaintiff's request for review in a letter dated April 10, 2020. *See* R. 1, 10. However, the Appeals Council references just one piece of submitted evidence – an EMG/Nerve Conduction Study – so it is assumed that the Appeals Council never even saw the letter written by Ms. Arnold, much less considered whether it warranted review of the ALJ's decision.

Nevertheless, Plaintiff has not even attempted to demonstrate good cause for his failure to timely submit this evidence to the ALJ. Plaintiff testified that he had begun utilizing a service dog 5 weeks prior to the April 2019 hearing. Additionally, Plaintiff had been seeing Ms. Arnold for weekly therapy appointments since October 2017. Yet, Plaintiff inexplicably failed to procure a letter from his therapist about his use of a service dog until well after the deadlines to submit additional evidence to the ALJ and the Appeals Council. Since Plaintiff did not show good cause for failing to timely submit the evidence, the Court need not address whether the evidence should have been considered by the Appeals Council. *See Knowlton v. Berryhill*, No. CV 18-0194 KBM, 2019 WL 1299669, at *5 (D.N.M. Mar. 21, 2019) ("The Court need not address whether the evaluation was new, material, and chronologically relevant, as Plaintiff did not pass the first hurdle of showing good cause for a delay in submitting the evidence."); *Carrera v. Berryhill*, No. 3:16-CV-742, 2018 WL 538748, at *4 (W.D.N.C. Jan. 23, 2018) (finding that, since the plaintiff did not show good cause for not previously submitting the evidence, the Appeals Council correctly

9

denied review of the ALJ's decision based on new evidence). A remand is not warranted on this basis.

*b. Service dog testimony*

With respect to Plaintiff's testimony about his service dog, the ALJ briefly addresses why she rejected that testimony:

> The claimant stated that he was terrified without his service dog, which he received only five weeks ago; however, his October 2018 treatment record reflects no panic attacks in several months, indicating reasonable improvement in his ability to manage his psychologically based symptoms.

R. 23. The October 2018 treatment record the ALJ references is one sentence of a treatment note by his therapist stating that Plaintiff "has not reported panic attacks in several months." R. 1005.

An ALJ's assessment of a plaintiff's subjective symptom allegations is given special deference and will be overturned only if it is patently wrong. *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *11 (N.D. Ill. June 1, 2021). An ALJ's decision to discredit a plaintiff's alleged symptoms is patently wrong if it lacks explanation or support. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). An assessment lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Id*.

In this case, the ALJ relied on one sentence contained in a single treatment note to infer that Plaintiff was experiencing "reasonable improvement" and, in effect, wholly misrepresented Plaintiff's treatment record to support her rejection of his testimony about the service dog. As an initial matter, there is no statement in the record from Plaintiff's therapist or psychiatrist that indicates that the break in panic attacks referred to in the October 2018 treatment note equated to "reasonable improvement in his ability to manage his psychologically based symptoms." Moreover, treatment notes from this same time period arguably contradict this conclusion. For

10

example, the particular treatment note the ALJ cites to is 4 sentences long, and 2 of the sentences state that Plaintiff continued to experience symptoms of anxiety and depression and various stressors. At numerous appointments between October and December 2018, Plaintiff was experiencing PTSD symptoms, various symptoms of depression, and increased anxiety and frustration. R. 466, 949, 951, 953, 956, 960, 964. In January 2019, Plaintiff continued to report symptoms of anxiety and depression and that month Plaintiff's psychiatrist, Dr. Shah, placed him on a new antidepressant to help with his depression and anxiety. R. 755, 945. The following month he was reported as saying that "everyday is a struggle" and that he was still having nightmares. R. 943.

This Court and others in this circuit consistently find that such selective presentation of evidence, or "cherry-picking," when assessing a plaintiff's subjective symptom allegations is improper. *See Martin B. v. Saul*, No. 19-2073, 2020 WL 6302360, at *5 (C.D. Ill. Sept. 2, 2020); *Bonnie F. v. Saul*, No. 18 CV 50417, 2020 WL 3414948, at *5 (N.D. Ill. June 22, 2020); *John R. F. v. Saul*, No. 18 C 6218, 2019 WL 2772564, at *2 (N.D. Ill. July 2, 2019); *Brenda L. C. v. Saul*, No. 218CV00328JVBMGG, 2019 WL 6686749, at *4 (N.D. Ind. Nov. 19, 2019), *report and recommendation adopted sub nom. Brenda C. v. Saul*, No. 2:18-CV-328-JVB-MGG, 2019 WL 6687658 (N.D. Ind. Dec. 5, 2019).

Here, the ALJ cherry-picked evidence when assessing Plaintiff's subjective allegations and ultimately relied on an inference not logically based on specific findings and evidence. Her assessment of Plaintiff's allegations regarding the service dog lacked support and, therefore, was patently wrong. Accordingly, the ALJ's rejection of Plaintiff's testimony is not supported by substantial evidence.

*ii. Medication side effects*

11

Plaintiff argues that the ALJ erred in evaluating the side effects of his medications. Pl.'s Br. at 9, Dkt. 20. Plaintiff first asserts that the ALJ misstated the side effects that he experienced from Xanax when she wrote that "Xanax causes no serious side effects, it relaxes him and causes sleepiness." *Id*. Plaintiff argues that Xanax did cause a serious side effect – sleepiness – and that the ALJ failed to explain why Plaintiff's testimony that he required 2 to 4-hour naps per day did not preclude employment. *Id*.

The Commissioner responds that the ALJ acknowledged Plaintiff's testimony that Xanax caused sleepiness. Def.'s Resp. at 8, Dkt. 25. He asserts that, although the ALJ did not specifically explain why she did not credit the testimony about Plaintiff's naps, the ALJ found Plaintiff's mental health symptoms were overall not as limiting as alleged. *Id*. at 9. He points out that the ALJ was not required to conduct a "point-by-point credibility assessment." *Id*.

The Seventh Circuit addressed a similar situation in *Cullinan v. Berryhill*, 878 F.3d 598 (7th Cir. 2017). The plaintiff had testified at the administrative hearing that she napped 1 to 4 hours each day due to her medications and difficulty sleeping at night, and the VE later testified that needing to take a 2-hour nap every day would rule out all work. *Id*. at 601-02. The ALJ ultimately omitted this from the RFC. The court stated:

> We are . . . troubled by the fact that the ALJ did not consider Cullinan's daily extended naps . . . in determining her residual functional capacity. No evidence in the record contradicted Cullinan's testimony about [this limitation], so only the adverse credibility determination could explain the ALJ's omission. But if the credibility finding was erroneous, Cullinan could well be adjudged disabled: the vocational expert said that needing to take a two-hour nap every day would rule out all work.

*Id*. at 605.

In this case, Plaintiff testified that Xanax made him so relaxed that he fell asleep. Specifically, he required long naps during the day due to his medication and insomnia. The VE testified that such an individual would be precluded from competitive work. Yet without explanation, the ALJ concluded that Xanax caused no serious side effects. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Because the VE testified that a person who required naps as often as Plaintiff would be precluded from competitive work and there is no evidence to contradict Plaintiff's testimony, the ALJ's silent rejection of Plaintiff's assertion concerning the side effects of Xanax is not supported by substantial evidence and remand is warranted on this basis. *See Robert M. W. v. Saul*, No. 19 C 3165, 2020 WL 6801842, at *3 (N.D. Ill. Nov. 19, 2020) (finding that the plaintiff's assertions about side effects of his medications were "central to the disability analysis" and that the ALJ's decision was not supported by substantial evidence where he failed to adequately explain why he rejected those assertions).

### B. Psychiatrist's opinion

Plaintiff argues that the ALJ's basis for finding the opinions of his psychiatrist, Dr. Shah, to be "of minimal persuasiveness" – that they were unsupported by treatment notes – is inaccurate. Pl.'s Br. at 12, Dkt. 20. Plaintiff asserts that treatment notes do support Dr. Shah's opinions and references several notes from the record. *Id*. The Commissioner responds that Plaintiff is urging the Court to second guess the ALJ's reasoning, which is contrary to the substantial evidence standard of review. Def.'s Resp. at 5, Dkt. 25. The Commissioner further argues that: (1) Plaintiff only cites to Dr. Shah's treatment notes from his initial visits with Plaintiff in October and November 2017; (2) the provisions Plaintiff cites to are almost exclusively Plaintiff's subjective

13

complaints rather than Dr. Shah's medical judgments; and (3) the objective findings and assessments within Dr. Shah's notes are consistent with the ALJ's analysis and fail to support the extreme limitations to which Dr. Shah opined.[3] *Id*. at 5-6.

The ALJ's decision to find Dr. Shah's opinions "of minimal persuasiveness" on the basis that they were unsupported by treatment notes is not supported by substantial evidence. As an initial matter, the ALJ does not indicate which treatment notes in the record she believes do not support Dr. Shah's opinions. The record contains over 18 months of mental health treatment notes including from a therapist Plaintiff was seeing weekly and a psychiatrist he was seeing monthly. The ALJ should have specifically identified the evidence in the record that supported her finding. The Court should not have to guess as to which records the ALJ thought supported her assertion that Dr. Shah's opinions were unsupported by treatment notes. "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Here, the ALJ's assessment did not articulate evidence in a manner that enables the Court to "trace the path of [her] reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir.1999) (internal quotation omitted); *see Richard K. v. Saul*, No. 18 C 7316, 2020 WL 1986985, at *4 (N.D. Ill. Apr. 27, 2020) ("[T]he ALJ's vague reference to unsupportive "treatment records" does not make this reason supported by substantial evidence."); *Kevin H. v. Saul*, No. 18-CV-5798, 2020 WL 6870818, at *4 (N.D. Ill. Nov. 23, 2020) (finding that the ALJ did not build an accurate and logical bridge to his

---

[3] The Commissioner's arguments suggest that Plaintiff's "subjective complaints" do not support the ALJ's analysis of Dr. Shah's opinions, but Dr. Shah's "medical judgments" and the "objective findings and assessments within Dr. Shah's notes" do support the ALJ's analysis. The Court finds that this is an impermissible *post hoc* rationalization. The Court is "confined to the rationales offered by the ALJ," not those later suggested by the Commissioner. *Shauger v. Astrue*, 675 F.3d 690, 695-96 (7th Cir. 2012); *see also Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018) ("the ALJ's decision cannot be defended on a basis not articulated in her order"); *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) ("the ALJ did not rely on this rationale in his opinion, so the Commissioner cannot now rely on it").

decision in part because he "did not provide any record citations or otherwise specify which account or records he was referring to").

Moreover, in this Court's review of the record, there are numerous treatment notes that could be construed as supportive of Dr. Shah's opinions. It is important to note that Plaintiff was diagnosed with major depressive disorder and has received treatment for it for years, and the very nature of Plaintiff's mental illness is that he may experience extended periods of more severe depression along with less intensive periods. *See* Candice L. Odgers, et al., *Capturing the Ebb and Flow of Psychiatric Symptoms with Dynamical Systems Models*, 166 Am. J. of Psychiatry 575 (May 1, 2009), https://ajp.psychiatryonline.org/doi/full/10.1176/appi.ajp.2008.08091398, ("Depression has been characterized as a "dynamical disease" in which symptoms wax and wane over time."); *Depression*, National Institute of Mental Health (2018), https://www.nimh.nih.gov/health/topics/depression ("A person . . . may have episodes of major depression along with periods of less severe symptoms."); Franco Benazzi, *Various forms of depression*, 8 Dialogues in Clinical Neuroscience 151 (June 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181770/ ("[D]epressions have a fluctuating course."). As shown below, the last six months of mental health treatment notes in the record did not unequivocally demonstrate Plaintiff was improving; rather, there is evidence to support a conclusion that Plaintiff's mental health underwent normal fluctuations and his symptoms waxed and waned over time.

In May 2018, Plaintiff reported that he was sleeping barely 2 to 3 hours per night due to nightmares and was experiencing frequent panic attacks and other PTSD symptoms, and Dr. Shah observed that Plaintiff's affect was somewhat anxious and tired. R. 841. At that appointment, Dr. Shah increased Plaintiff's Xanax dosage from 3 times daily to 4 times daily and also began

15

prescribing Prazosin for Plaintiff's nightmares. *Id*. Dr. Shah also offered to prescribe Plaintiff an antidepressant at that time, but Plaintiff declined. *Id*. Plaintiff also reported to his therapist at Sinnissippi Centers that he was scared of the effect that the stress of court has had on his health, that he was struggling to relax, and that he had been having nightmares about court. R. 988.

In the summer of 2018, Plaintiff reported benefitting from the increased dosage of Xanax and newly prescribed Prazosin but still reported feeling worried and experiencing symptoms of depression. R. 836, 978, 980. He shared that he had been "obsessed" with court and was still having occasional dreams about court cases. *Id*. In September 2018, Plaintiff was still working on processing his anxiety about upcoming court dates. R. 968, 970. He reported his nightmares were not as bad as they used to be and he was sleeping well while on vacation, but his sleep again became less restful upon returning home. R. 833. Dr. Shah recommended starting a small dose of melatonin to help Plaintiff sleep better at night. *Id*.

In October 2018, Plaintiff was processing symptoms of PTSD and dissociation with his therapist, who noted that he was struggling with processing emotions and past trauma. R. 466, 962, 964. Plaintiff acknowledged that he had gained some insight into himself but due to the stressors of court, his issues with sleep and anxiety had increased. R. 466. He reported feeling anxiety about his children and frustration, explaining that some days "it would be easier to give up." R. 960. Plaintiff reported that his sleep was somewhat better since he began taking melatonin, and Dr. Shah increased his dose of Prazosin to help with flashbacks and nightmares. R. 825. At the end of October and throughout November 2018, Plaintiff vacillated between feeling more hopeful and stable and feeling frustrated. R. 794, 954 956, 958.

By December 2018, however, Plaintiff reported feeling depressed, frustrated, and upset and his therapist observed that he appeared distressed. R. 953. At another appointment that month,

16

Plaintiff reported that he had been feeling depressed for about a month and had not showered in 3 days. R. 951. The therapist observed that Plaintiff became tearful and appeared to be conflicted and stressed. *Id*. She noted that Plaintiff would benefit from group therapy and possibly a medication change. *Id*. Towards the end of the month, Plaintiff reported continuing to struggle with symptoms of depression including isolation, decreased interest in hobbies, decreased sex drive, and no motivation. R. 949. The therapist observed that he appeared to be struggling with increased anxiety and depression. *Id*. Additionally, the cardiologist Plaintiff had been seeing for several months for chest pain observed that his symptoms appeared to be non-cardiac in origin and possibly largely related to anxiety. R. 759.

In January 2019, Plaintiff reported that he remained hopeful, but his therapist noted that he became visibly upset and reported chest pain when discussing his ex-wife and court. R. 947. Plaintiff reported to Dr. Shah that he was feeling depressed and anxious again. R. 755. He stated that he was using more Xanax than prescribed and was aware that people were watching him due to his ongoing court case. *Id*. Dr. Shah decided to start Plaintiff on an antidepressant to help with both depression and anxiety. *Id*. In February 2019, he reported that "everyday is a struggle" and that he was sleeping well except for having some nightmares. R. 943.

In light of the above evidence, it was inappropriate for the ALJ to focus exclusively on the treatment notes commenting that Plaintiff appeared to be more stable and ignore the treatment notes that demonstrated Plaintiff's severe symptoms, even as late as January 2019 when Dr. Shah prescribed him a new antidepressant. *See Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010) ("More importantly, symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression."); *Phillips v. Astrue,* 413 Fed. App'x. 878, 886 (7th Cir. 2010) ("The ALJ's assessment of the medical record also demonstrates a misunderstanding about the nature of

17

mental illness . . . Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *see also Rosario v. Saul*, No. 18-CV-1878, 2019 WL 3997139, at *5 (E.D. Wis. Aug. 22, 2019); *Sabey v. Colvin*, No. 14 CV 3301, 2015 WL 9182518, at *7 (N.D. Ill. Dec. 17, 2015); *Ritacco v. Colvin*, No. 13 C 6757, 2015 WL 5050140, at *6 (N.D. Ill. Aug. 25, 2015). Therefore, the Court finds that the ALJ's assessment of Dr. Shah's opinions is not supported by substantial evidence. On remand, the ALJ must articulate which treatment notes she finds to be inconsistent with Dr. Shah's opinions as well as address the evidence that does not support her conclusion.

### C. Mental RFC

Lastly, Plaintiff argues that the mental RFC assessment lacks substantial support because the ALJ improperly played doctor by ignoring expert opinions to arrive at her own incorrect interpretation of the medical evidence. Pl.'s Br. at 15, Dkt. 20. However, because the Court is remanding on the issues identified above the Court need not address this argument.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion.

Date: June 11, 2021        By: *Lisa A. [signature]*
Lisa A. Jensen
United States Magistrate Judge